**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-01581-JLK

BARBARA FAYEULLE,
MATTHEW GENTRUP, and
CAROL A. LIETZ,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

CIGNA CORPORATION,
CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
CIGNA HEALTH AND LIFE INSURANCE COMPANY,
COLUMBINE CHIROPRACTIC PLAN, LLC, d/b/a COLUMBINE HEALTH
PLAN,
AMERICAN SPECIALTY HEALTH INCORPORATED, and
AMERICAN SPECIALTY HEALTH GROUP, INC.,

      Defendants.

_____

**PLAINTIFFS' OPPOSITION TO COLUMBINE CHIROPRACTIC PLAN, LLC,
AMERICAN SPECIALTY HEALTH, INCORPORATED, AND AMERICAN
SPECIALTY HEALTH GROUP, INC.'S MOTIONS TO DISMISS
SECOND AMENDED COMPLAINT**

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iv

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 3

    A.    Cigna's Delegation of Claims Administration to ASH and Columbine ........................................................................................ 3

    B.    Cigna, ASH, and Columbine Secretly Shift Administrative Fees to Insureds. ........................................................................................ 4

    C.    Plaintiffs Receive Chiropractic Care and Are Charged for Defendants' Administrative Fees. ............................................................ 6

        1.    Allegations as to Columbine (Ms. Fayeulle and Mr. Gentrup) .......... 6

        2.    Allegations as to ASH (Ms. Lietz) .................................................... 9

LEGAL STANDARD .................................................................................................. 10

ARGUMENT ................................................................................................................ 11

I.    PLAINTIFFS STATE VALID RICO CLAIMS AGAINST ASH AND COLUMBINE (COUNTS I AND II). ................................................................ 11

    A.    The Second Amended Complaint Adequately Sets Forth a RICO Enterprise with Respect to ASH and Columbine. ..................................... 12

        1.    Plaintiffs Have Alleged a Plausible RICO Enterprise That Includes Columbine, ASH, and Cigna. ............................................ 12

        2.    ASH's Suggestion that Cigna, ASH, and Columbine are Effectively the Same Entity for RICO Purposes Lacks Merit. ........ 14

    B.    The Second Amended Complaint Adequately Alleges ASH and Columbine's Participation in the Enterprise. ............................................. 16

    C.    The Alleged Predicate Acts of Fraud Easily Meet the Rule 9(b) Standard. ..................................................................................................... 18

    D.    ASH and Columbine's Arguments on the Pattern Element are Wholly Devoid of Any Support. ................................................................ 22

    E.    The Allegations in the Second Amended Complaint Are Sufficient to Let the RICO Conspiracy Claim Go Forward. ............................................ 25

II.    PLAINTIFFS STATE VALID ERISA CLAIMS AGAINST ASH AND COLUMBINE (COUNTS III AND IV). ............................................................... 27

    A.    Plaintiffs Allege That ASH and Columbine Are Fiduciaries. ..................... 27

B.      Plaintiffs Allege that ASH and Columbine Breached Their Fiduciary
        Duties. .......................................................................................................... 30

C.      Plaintiffs Have Standing to Pursue Their ERISA Claims. .......................... 32

CONCLUSION .............................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004) ...................................................................................... 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 10

*BancOklahoma Mortgage Corp. v. Capital Title Co.*,
194 F.3d 1089 (10th Cir. 1999) ....................................................... 14, 16, 17

*Bixler v. Foster*,
596 F.3d 751 (10th Cir. 2010) ......................................................... 22, 23, 24

*Boone v. Carlsbad Bancorporation, Inc.*,
972 F.2d 1545 (10th Cir.1992) ..................................................................... 24

*Boyle v. United States*,
556 U.S. 938 (2009) ...................................................................................... 12

*Brannon v. Boatmen's First National Bank of Oklahoma*,
153 F.3d 1144 (10th Cir. 1998) ....................................................... 14, 15, 20

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ...................................................................................... 21

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014) .................................................................... 26

*Chase v. Bank of New York*,
No. 13-cv-02265-RBJ-KMT, 2014 WL 1797473 (D. Colo. May 6, 2014).................. 21

*David P. Coldesina D.D.S. v. Estate of Simper*,
407 F.3d 1126 (10th Cir. 2005) .................................................................... 30

*Dawson v. Goldman Sachs & Co.*,
2014 WL 5465127 (D. Colo. Oct. 27, 2014) ............................................... 18

*Duran v. Carris*,
238 F.3d 1268 (10th Cir. 2001) .................................................................... 24

*Emery v. Am. Gen. Fin., Inc.*,
134 F.3d 1321 (7th Cir. 1998) ...................................................................... 21

*Fitzgerald v. Chrysler Corp.*,
116 F.3d 225 (7th Cir. 1997) ............................................................... 14, 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) ...................................................................................... 33

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989 .................................................................................................. 22

*Hall v. Witteman*,
  584 F.3d 859 (10th Cir. 2009) ................................................................................ 24

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*,
  751 F.3d 740 (6th Cir. 2014) .................................................................................. 31

*ILWU-PMA v. Connecticut General Life Ins. Co.*,
  2015 WL 9300519 (N.D. Cal. Dec. 22, 2015)......................................................... 29

*Imperial Capital Bank v. Sussex Grp., LLC*,
  2009 WL 2497326 (W.D. Okla. Aug. 17, 2009) ..................................................... 18

*In re AEP ERISA Litig.*,
  327 F. Supp. 2d 812 (S.D. Ohio 2004) ................................................................... 27

*Koch v. Koch Indus., Inc.*,
  203 F.3d 1202 (10th Cir. 2000) .............................................................................. 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S.Ct. 1377 (2014).............................................................................................. 11

*Medina v. Catholic Health Initiatives*,
  No. 13-CV-01249-REB-KLM, 2014 WL 4852272 (D. Colo. Sept. 30, 2014) ............ 27

*Morrow v. Black*,
  742 F. Supp. 1199 (E.D.N.Y. 1990) ........................................................................ 19

*Phelps v. Wichita Eagle-Beacon*,
  886 F.2d 1262 (10th Cir. 1989) .............................................................................. 21

*Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*,
  722 F.3d 861 (6th Cir. 2013) .................................................................................. 31

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985).................................................................................................. 22

*Shepard v. DineEquity, Inc.*,
  2009 WL 8518288 (D. Kan. Sept. 25, 2009).................................................. 14, 19, 26

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) ...................................................................... 17, 18, 21

*Thomas v. Kaven*,
  765 F.3d 1183 (10th Cir. 2014) .............................................................................. 10

*Torwest DBC, Inc. v. Dick*,
  628 F. Supp. 163 (D. Colo. 1986 ...................................................................... 24, 25

*Trustees of the Colorado Laborers' Health and Welfare Trust Fund v. American Benefit Plan Administrators, Inc.*,
2006 WL 2632308 (D. Colo. Sept. 13, 2006) ............................................................ 28

*United States v. Hutchinson*,
573 F.3d 1011 (10th Cir. 2009) ................................................................................ 13

*United States v. Kamahele*,
748 F.3d 984 (10th Cir. 2014) ................................................................................. 20

*United States v. Rodriguez-Aguirre*,
264 F.3d 1195 (10th Cir. 2001) ............................................................................... 11

*United States v. Zang*,
703 F.2d 1186 (10th Cir.1982) ........................................................................... 24, 25

*VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*,
29 F. Supp. 2d 1253 (D. Kan. 1998) .................................................................. 14, 17

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................. 26

*Wood v. Wells Fargo Bank, N.A.*,
Civ. No. 13-cv-01731-CMA-KMT, 2013 U.S. Dist. LEXIS 152196
(D. Colo. Oct. 2, 2013) ............................................................................................ 21

## STATUTES

18 U.S.C. § 1962(c) .......................................................................................... 2, 19, 25
18 U.S.C. § 1962(d) .......................................................................................... 2, 11, 25
29 U.S.C. § 1002(21)(A) ........................................................................................... 27
29 U.S.C. § 1104(a)(1)(B) ......................................................................................... 30
29 U.S.C. § 1105 .................................................................................................. 30, 31
29 U.S.C. § 1106 ....................................................................................................... 32
29 U.S.C. § 1106(a)(1)(D) ......................................................................................... 30
29 U.S.C. § 1106(b) .................................................................................................. 30
29 U.S.C. § 1132(a)(1)(B), (a)(3) .............................................................................. 33

## RULES

Fed. R. Civ. P. 9(b) ............................................................................................. 18, 21
Fed. R. Civ. P. 12(b)(1) ............................................................................................ 11
Fed. R. Civ. P. 12(b)(6) .................................................................................. 10, 11, 16

Plaintiffs Barbara Fayeulle, Matthew Gentrup, and Carol Lietz submit this memorandum in opposition to the motions to dismiss filed by American Specialty Health, Incorporated and American Specialty Health Group, Inc. (collectively, "ASH") (ECF No. 48) and by Columbine Health Plan, LLC ("Columbine") (ECF No. 49). Plaintiffs are filing a separate opposition to the motion to dismiss filed by Defendant Cigna Corporation and its subsidiaries, Defendants Connecticut General Life Insurance Company and CIGNA Health and Life Insurance Company (collectively, "Cigna"). Plaintiffs incorporate that opposition herein by reference. This opposition addresses the arguments for dismissal that are specific to ASH and Columbine.

## INTRODUCTION

Plaintiffs allege that ASH and Columbine colluded with Cigna to charge insureds and plans for their administrative fees under the guise that they were medical expenses. Cigna subcontracted with ASH and Columbine to adjudicate benefits claims submitted by chiropractors and physical therapists, in exchange for a fee paid by Cigna. But instead of paying that fee, Cigna, ASH, and Columbine cooperated to secretly charge the fees to insureds, including Plaintiffs, and their health benefits plans. When a provider would submit a bill to ASH and Columbine for a benefits determination, ASH and Columbine would add their own administrative fee to the provider's agreed charge and then submit the whole bill to Cigna for payment. Cigna would collect the payment from the insureds and plans and then forward it to ASH and Columbine, who would take their respective cut and then pay the providers the rest. Then, Cigna reported to the insureds and plans in Explanation of Benefit forms ("EOBs") that they were paying for expenses charged by

1

medical providers, not administrative fees charged by Cigna's Subcontractors. ASH and Columbine helped conceal the fraud: when they communicated to providers about the amounts the insureds and plans had been charged, they omitted the amounts that the insureds and plans were charged for the administrative fees.

Based on this conduct, Plaintiffs allege claims against ASH and Columbine under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d), and the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs allege that ASH and Columbine violated RICO by their active participation with Cigna in the fraudulent scheme. Ms. Fayeulle and Ms. Lietz (whose plans were governed by ERISA) also allege that ASH and Columbine breached their *de facto* ERISA fiduciary duties to them and the plans when they improperly exercised their discretion to add non-covered administrative fees to charges for medical expenses.

In their motions to dismiss, ASH and Columbine fail to show that Plaintiffs have not pleaded viable RICO and ERISA claims. As to RICO, ASH and Columbine mainly resort to a strategy of ignoring most of the factual allegations in the complaint, which of course is improper on a motion to dismiss. The complete allegations—which must be taken as true on this motion—show that ASH and Columbine actively participated in, and indeed were essential to, the fraud. They provided the input—the inflated charges for provider services—that Cigna then used to collect the charges from insureds and issue false EOBs. And they helped conceal the fraud. Although ASH and Columbine try to shift the blame for the scheme solely to Cigna, they cannot.

As to the ERISA claims, ASH and Columbine argue that Ms. Fayeulle and Ms. Lietz have failed to plead fiduciary status or that they breached fiduciary duties. The allegations of the complaint are to the contrary—Cigna delegated its discretionary authority to administer claims to ASH and Columbine, and in exercising that authority, ASH and Columbine improperly added their own fees to provider charges. This breached their fiduciary duties to Ms. Fayeulle and Ms. Lietz, and they may be held liable.

## FACTUAL BACKGROUND[1]

### A.   Cigna's Delegation of Claims Administration to ASH and Columbine

Cigna serves as a claims administrator for health benefits plans, including "self-insured plans"—in which the plan sponsor (usually an employer) funds medical costs—and "fully-insured plans"—in which claims are funded by premiums paid by the sponsor or individual insureds. 2d Am. Compl. (ECF No. 36) ¶ 17. As claims administrator, Cigna is responsible for making determinations about the payment of health benefits claims and providing insureds with a network of providers who have agreed to accept discounted fees. *Id.* ¶ 19. Historically, Cigna handled this work on its own. In recent years, however, it has delegated its responsibilities for processing and adjudicating claims to Subcontractors. *Id.* ¶¶ 27, 28.

ASH and Columbine are two of these Subcontractors. *Id.* ¶ 28. Cigna hired them to administer chiropractic and physical therapist services for its insureds. *Id.* A chiropractor or a physical therapist who wants to be part of Cigna's network—as an "in-

---

[1] Plaintiffs' factual allegations are taken as true for purposes of this motion. *See infra* 10-11.

3

network provider"—must enter into an in-network contract with ASH or Columbine. *Id.* For example, each chiropractor in Columbine's network must enter into a provider agreement under which it agrees to provide chiropractic services to insureds at reduced rates. *Id.* ¶ 41. Columbine does not itself provide medical services. *Id.* ¶ 39.

When a provider who is in-network with a Subcontractor like Columbine or ASH renders service to a Cigna insured, Cigna and the Subcontractor instruct the provider to submit the resulting claim for insurance benefits to the Subcontractor. *Id.* ¶ 30. The providers identify the services they provided to their patients by CPT Code (a five-digit number used to identify individual health care services), along with describing their "usual and customary" charge for the service. *Id.* The Subcontractor reviews the claim, makes a benefits determination, and then pays the provider as set forth in the in-network rate schedule. *Id.* ¶¶ 31, 40, 47. Cigna then reimburses the Subcontractor. *Id.* ¶ 31.

**B.   Cigna, ASH, and Columbine Secretly Shift Administrative Fees to Insureds.**

Under their agreements with Cigna, ASH and Columbine are entitled to fees from Cigna for their services in administering claims and the provider networks. *Id.* ¶¶ 29, 32. But Defendants want to avoid forcing Cigna to pay those fees. *Id.* ¶ 32. If Cigna had to pay the fees, they would either (i) reduce Cigna's profits or (ii) lead to increases in the premiums and administrative service fees that Cigna charges, thus harming demand for its (and, consequently, the Subcontractors') services. *Id.* ¶ 32. Therefore, instead of having Cigna pay the fees, Defendants covertly pass them along to insureds and plans as "medical expenses." *Id.*

4

They do this by having Cigna issue a misleading EOB to insureds for claims submitted to ASH and Columbine. *Id.* The EOBs misrepresent that the Subcontractor is the "provider" of the medical services. *Id.* ¶ 33. They add the amount that Cigna owes to the Subcontractor to the provider's actual allowable charge, and then treat the artificially inflated total in the EOB as the "allowed" or "covered" medical expense amount payable by the insured or plan. *Id.* In other EOBs, Cigna simply inflates the amount charged for medical services without resorting to this subterfuge. *Id.*

The Subcontractors, meanwhile, send Compensation Summaries or Remittance Advice forms to providers that report the provider's "usual and customary charge," the allowed amount based on the in-network fee schedule, and the amount paid by the Subcontractor to the provider. *Id.* ¶ 35. However, these forms do not include or disclose the Subcontractor's administrative fees, or reveal that Cigna and the Subcontractor are charging the insured an inflated amount, which the Subcontractor keeps. *Id.* This conceals the fees from providers, who therefore cannot inform their patients about them. *Id.*

By this method, Cigna and the Subcontractors are able to secretly collect the Subcontractors' fees from Cigna's insureds and self-insured plans. *Id.* ¶ 37. Insureds unknowingly use their ERISA plan funds to pay for these fees, rather than using those funds for medical services. *Id.* To the extent that insureds owe deductibles or co-insurance, they are forced to pay the fees out of pocket. *Id.* And when the insureds' plans limit coverage for the services, the fees deplete those coverage limits more quickly, meaning that insureds can purchase less medical care. *Id.*

### C.    Plaintiffs Receive Chiropractic Care and Are Charged for Defendants' Administrative Fees.

#### 1.    Allegations as to Columbine (Ms. Fayeulle and Mr. Gentrup)

Plaintiff Barbara Fayeulle is a Cigna insured under the Seagate US LLC Open Access Plus Medical Benefits (High Deductible Health Plan 1). *Id.* ¶ 4. During 2013, Ms. Fayeulle received health care services from her chiropractor, Dr. Douglas Brisson. *Id.* ¶¶ 63-68. Dr. Brisson had entered into a Provider Agreement with Columbine and thus was an in-network provider under Ms. Fayeulle's plan. *Id.* ¶ 63. Cigna repeatedly imposed excessive charges on Ms. Fayeulle and her plan to pay for Columbine's administrative fees. *Id.* ¶ 68.

For example, on May 8, 2013, Ms. Fayeulle received treatment from Dr. Brisson. *Id.* ¶ 63. Dr. Brisson submitted the claim for benefits to Columbine on June 27, 2013. *Id.* ¶ 64. With Cigna's knowledge and encouragement, when Columbine submitted the claim to Cigna, it billed Cigna for its administrative fees in addition to Dr. Brisson's agreed rate for medical services. *See id.* ¶ 42. On July 1, 2013, Ms. Fayeulle received an EOB from Cigna stating that the "Amount Billed" was $55.00, that the "Covered Amount" was $55.00, and that Ms. Fayeulle owed a "co-pay/deductible" of $55.00. *Id.*¶ 66. That money was deducted from her HSA. *Id.*

However, under the fee schedule in the Columbine Provider Agreement, Columbine was only to pay $45.00 per office visit. *Id.* ¶ 67. Thus, the additional $10.00 in the "Covered Amount" was a charge for Columbine's administrative fee, not a payment to a doctor for covered medical services. *Id.* The EOB that Ms. Fayeulle

received misrepresented the nature of this charge. *Id.* Cigna and Columbine repeated this conduct on other occasions. *Id.* ¶ 68.

When Ms. Fayeulle discovered these fraudulent and excessive charges, she reported them to Cigna. *Id.* ¶ 69. In an effort to avoid her pursuing her grievance, Cigna refunded $60 in administrative fees Ms. Fayeulle had paid, but it did not pay her interest on the charges or transfer the money back to her HSA. *Id.* It also took the position that its relationship with Columbine was "no different from its relationship with other medical providers," and told her it would not change its procedures or refund fees in the future. *Id.*

Plaintiff Matthew Gentrup is a Cigna insured under the City of Loveland Open Access Plus Medical Benefits HRA Benefits. *Id.* ¶ 5. This plan is self-insured by the City of Loveland, and CGLIC provides claim administration for the plan. *Id.* The documents for Mr. Gentrup's plan state that benefits are limited to medical expenses based on charges by medical providers and do not refer to administrative fees charged by Subcontractors. *Id.* ¶¶ 70-73. The plan documents also state that HRA funds are used only to cover "qualified medical expenses." *Id.* ¶ 74.

In 2011, Mr. Gentrup received health care services from his chiropractor, Dr. Greg Crawford. *Id.* ¶¶ 75-79. For example, on April 27, 2011, Dr. Crawford performed a spinal manipulation (code 98940), for which he billed $36.00, and electrical stimulation (code 97014), for which he billed $19.00. *Id.* Thus, his total bill was $55.00. *Id.* Dr. Crawford submitted the bill to Columbine. *Id.* With Cigna's knowledge and encouragement, when

Columbine submitted the claim to Cigna, it billed Cigna for its administrative fees in addition to Dr. Crawford's agreed rate for medical services. *See id.* ¶ 42.

On or about May 11, 2011, Mr. Gentrup received an EOB from CGLIC. *Id.* ¶ 76. The EOB stated that Dr. Crawford was the "provider," and accurately reported that Dr. Crawford had billed $19 for the electrical stimulation. *Id.* However, it falsely stated that Dr. Crawford had billed $61.00 for the spinal manipulation. *Id.* The EOB stated that the electrical stimulation was not covered, and therefore the total "Covered Amount" was $61.00—$25.00 more than Dr. Crawford had charged for the only covered service, the manipulation. *Id.* The full $61.00 was removed from Mr. Gentrup's HSA. *Id.*

On June 13, 2011, Dr. Crawford received a Compensation Summary from Columbine stating that he would be paid a total of $45 for his services to Mr. Gentrup. *Id.* ¶ 77. The Compensation Summary, however, did not disclose that Defendants had charged Mr. Gentrup $45.00 for the spinal manipulation and $16.00 more for their administrative fees. *Id.*

When Mr. Gentrup later found out that Cigna and Columbine were imposing their administrative fees on him in this manner, he switched to paying out of pocket for chiropractic services so that Columbine would no longer determine his benefit payments. *Id.* ¶ 80.

In 2015, Columbine changed its arrangement with providers to increase their purported daily rate to $58. *Id.* ¶ 43. This total included the provider's actual allowed daily charge ($45) and an administrative fee charged by Columbine ($13). *Id.* ¶¶ 43-45. The new provider agreement required providers to then pay the $13 administrative fee

back to Columbine. *Id.* ¶ 44. By this mechanism, Columbine and Cigna continue to collect the $13 fee from insureds and plans under the guise that it is an expense for medical services. *Id.* ¶ 45.

### 2. Allegations as to ASH (Ms. Lietz)

Plaintiff Carol Lietz was insured by Cigna until December 31, 2013 pursuant to the Siemens Corp. Group Ins. and Flexible Benefits Program. *Id.* ¶ 6. On March 24-26, 2012, Ms. Lietz was treated by Inchiostro Chiropractic, Inc. *Id.* ¶ 85. Dr. Inchiostro billed $160 in total for five separate services and submitted the bill to ASH. *Id.* With Cigna's knowledge and encouragement, when ASH submitted the claim to Cigna, it billed Cigna for its administrative fees in addition to Dr. Inchiostro's agreed rate for the medical services. *Id.* ¶ 48.

Ms. Lietz received an EOB from Cigna for the services that represented that it was a "summary of a claim … for services provided by Amer Spec Hlth Cleaingh." *Id.* ¶ 86. This was misleading, because ASH is not a provider and did not render services to Ms. Lietz. *Id.* The EOB also misleadingly reported that the "amount billed" for Ms. Lietz's "visit" was $127.28. *Id.* ¶ 87. In fact, the provider billed $160, but his agreement with ASH only allowed him to collect $88. *Id.* The EOB stated that the entire $127.28, with no discount, was paid from Ms. Lietz's HSA. This was $39.28 more than the provider received for the services, and the difference constituted ASH's secretly-charged administrative fee. *Id.*

On June 12, 2012, Dr. Inchiostro received a remittance from ASH stating that the "allowed amount" for the service was $88.00 and the "claim paid amount" was that total.

*Id.* The remittance did not disclose that Cigna and ASH had actually collected $127.28 from Ms. Lietz and pocketed the $39.28 difference. *Id.* ASH and Cigna repeated this conduct for other chiropractor visits by Ms. Lietz. *Id.* ¶ 88.

When providers asked ASH about its practices, ASH told one provider that it priced claims "according to the fee schedule," then forwarded them "to the health plan to have the member's benefit applied." *Id.* ¶ 49. It acknowledged that this can "sometimes result" in the "patient responsibility being higher than the ASH Networks Fee Schedule"—*i.e.*, that the patient would have to pay more than the provider had agreed to receive. *Id.* It also stated that its remittances to providers would not "verify the patient responsibility" because patient charges were based on "[ASH's] charged amount" under its agreement with Cigna, and that this was "confusing." *Id.* ¶ 50.

## LEGAL STANDARD

On a motion to dismiss pursuant to Rule 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014). Under Rule 12(b)(6), the Court assesses whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1190-91 (quoting *Ashcroft*, 556 U.S. at 678).

ASH also asks the Court to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. ASH's arguments that the Court lacks constitutional jurisdiction over certain

claims or issues are a facial attack on the complaint, and thus, the Court must take Plaintiffs' allegations as true, as it would under Rule 12(b)(6). *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). Issues of "statutory standing," such as whether Plaintiffs have stated claims that they are permitted to pursue under ERISA, are considered under Rule 12(b)(6). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387-88 & n.4 (2014).

## ARGUMENT

## I.    PLAINTIFFS STATE VALID RICO CLAIMS AGAINST ASH AND COLUMBINE (COUNTS I AND II).

Columbine and ASH attack Plaintiffs' RICO claims from every possible angle—arguing that the "enterprise" element is not satisfied, there are no allegations they "conducted" or "participated" in the enterprise, there are no plausible allegations of a "pattern" of racketeering activity, the "predicate racketeering acts" are not sufficiently pleaded, and the § 1962(d) conspiracy charge fails for lack of a substantive RICO violation, or else no conspiratorial agreement. *See* Columbine Mot. 7-18; ASH Mot. 6-11. ASH and Columbine can only superficially maintain these arguments, however, by ignoring significant portions of Plaintiffs' complaint. Even a cursory review of Plaintiffs' pleading demonstrates that ASH and Columbine's arguments for dismissal of the RICO claims are without merit.

**A.      The Second Amended Complaint Adequately Sets Forth a RICO Enterprise with Respect to ASH and Columbine.**

**1.      Plaintiffs Have Alleged a Plausible RICO Enterprise That Includes Columbine, ASH, and Cigna.**

Columbine argues that Plaintiffs' allegations do not plausibly state a RICO enterprise because there are no factual allegations supporting (1) a "common purpose" or (2) a structure apart from a "routine commercial relationship." Columbine Mot. 12-13. Similarly, ASH argues that the enterprise allegations fail because they do not identify "a structure independent of [Cigna and ASH's] normal commercial dealings." ASH Mot. 9. These arguments both mischaracterize Plaintiffs' allegations and misconstrue the applicable case law. For the reasons set forth in Plaintiffs' opposition to Cigna's motion, Plaintiffs have sufficiently alleged that ASH, Columbine, and Cigna formed an associated-in-fact enterprise, *i.e.*, a "continuing unit that function[ed] with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009).

As to ASH and Columbine, Plaintiffs allege specific acts that aided Cigna in its scheme, underscoring the existence of a common purpose between them. Both ASH and Columbine included their administrative fees in providers' charges when they submitted them to Cigna for payment by insureds and plans. 2d Am. Compl. ¶¶ 42, 48. Cigna exercised oversight over ASH and Columbine's claims administration, and it knew about and encouraged this practice. *Id.* ¶¶ 42, 46, 48. Then, when ASH and Columbine paid providers and reported on the benefits that the insureds and plans had paid, they then omitted the administrative fee charges from the totals, further concealing the payments. *Id.* ¶¶ 48-50, 77, 88. These allegations, accepted as true, evince a concerted effort and

common purpose supporting the existence of a RICO enterprise. *See United States v. Hutchinson*, 573 F.3d 1011, 1022 (10th Cir. 2009) (to establish enterprise, plaintiff must show that "members of the alleged enterprise shared a common purpose, that they interacted or associated in some way to advance this shared purpose, and that the members of the enterprise so functioned long enough to complete a pattern of racketeering activity," and "no more is required to show that an enterprise has the requisite structure").

Although Columbine argues it could not have shared in the purpose of Cigna's fee-shifting scheme because it "was entitled to the same flat fees under the Cigna-Columbine [agreement] regardless of how Cigna characterized any such fees to Plaintiffs" (Columbine Mot. 13 (emphasis omitted)), its own actions belie the point. If the scheme did not benefit Columbine, why would Columbine add the fees to provider charges rather than simply collecting them directly from Cigna? The answer is that Columbine benefited from the practice because it increased Cigna's, and consequently, Columbine's, competitive advantage. 2d Am. Compl. ¶ 32 ("[I]n order to maximize Cigna's profits … and to enhance Cigna's (and consequently, the Subcontractors') competitive advantage … Defendants covertly pass [administrative fees] along either to the insured or the plan as a 'medical expense.'").

Columbine also argues that Plaintiffs are required to show a relationship "independent" from Defendants' "business dealings" to establish an enterprise. Columbine Mot. 3. Not so. It is clear that "a commercial contract can serve as the basis of a RICO enterprise." *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F. Supp. 2d 1253,

1259 (D. Kan. 1998); *see also Shepard v. DineEquity, Inc.*, Civ. Action No. 08-2416-KHV, 2009 WL 8518288, at *6-7 (D. Kan. Sept. 25, 2009) (rejecting argument that "a licensing agreement is not a RICO enterprise"). And this is not a case in which a party to a business relationship was an unwitting accomplice to a fraudulent scheme. Plaintiffs plausibly allege that ASH and Columbine intentionally advanced the enterprise's shared purpose of secretly collecting the administrative fees from insureds and plans.[2]

### 2. ASH's Suggestion that Cigna, ASH, and Columbine are Effectively the Same Entity for RICO Purposes Lacks Merit.

ASH adds the novel argument that because Cigna has "historically" handled claims administration on its own, its decision to subcontract with a separate corporate entity (ASH) cannot create an enterprise. ASH Mot. 9 & n.4 (citing *Brannon v. Boatmen's First Nat'l Bank of Oklahoma*, 153 F.3d 1144 (10th Cir. 1998) and *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227-28 (7th Cir. 1997)). In other words, ASH contends that Cigna, ASH, and Columbine are effectively the same "person" under RICO, and therefore do not meet the Tenth Circuit's requirement that the "person" conducting the enterprise must be "distinct from the alleged 'enterprise." *See Brannon*, 153 F.3d at 1146-47.

ASH's concept that it is the same "person" as Columbine and Cigna for RICO purposes is a plain misreading of *Brannon*. The *Brannon* court addressed a parent-

---

[2] Columbine's enterprise argument seems to overlap with its discussion of *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089 (10th Cir. 1999), under the "participation" prong of RICO. *See* Columbine Mem. 9-11. As will be explained below, *BancOklahoma* actually demonstrates that a "commercial arrangement" in which one company helps another company commit fraud can give rise to RICO liability. *See infra* 16-18.

subsidiary relationship, where the parent was alleged to be the person and the subsidiary was alleged to be the enterprise (or vice versa). *Id.* at 1145. Of course, there is no question in this case that Cigna, ASH, and Columbine have no such relationship of control or ownership. Moreover, while the *Brannon* court held that the alleged parent-subsidiary relationship did not create an enterprise "standing alone," it only did so because "the complaint allege[d] no activity on the part of Bancshares [the parent] that might reasonably be understood to implicate it in the scheme attributed to Boatmen's [the subsidiary]." *Id.* at 1149. The basic question was whether "the relationship between [the two entities] allowed the defendant bank to perpetrate or conceal the alleged mail fraud." *Id.*

Here, aside from the fact that Cigna, ASH, and Columbine have separate corporate identities that are distinct from their alleged association-in-fact enterprise, Plaintiffs have alleged that ASH and Columbine's participation was necessary to inappropriately pass on the administrative fees. For example:

- "When the Subcontractors submit provider claims to Cigna, they include their administrative fees in the charges. Cigna then misrepresents in the EOBs that the Subcontractor is the health care 'provider' so that Cigna can misrepresent that the administrative fees are being charged by a provider for medical services . . . ." 2d Am. Compl. ¶ 33.

- "[W]hen [ASH] submits the claims it processes to Cigna, it bills Cigna for its administrative fees in addition to the providers' agreed rates for medical services. The EOBs that Cigna then provides for services in the [ASH] network misleadingly describe the provider as 'American Specialty Physi,' . . . ." 2d Am. Compl. ¶ 48.

In short, this is a scheme whereby Defendants take advantage of the fact that ASH and Columbine are separate entities from Cigna.[3] Therefore, Plaintiffs' allegations meet the requirement that the defendant "persons" must be distinct from the alleged association-in-fact enterprise.

### B. The Second Amended Complaint Adequately Alleges ASH and Columbine's Participation in the Enterprise.

Columbine and ASH further contend that Plaintiffs fail to allege that they "participated in the conduct of the [RICO] enterprise." Columbine Mot. 8; ASH Mot. 10.[4] Columbine relies extensively on *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089 (10th Cir. 1999). As an initial matter, Columbine overlooks that *BancOklahoma* was a decision on a motion for summary judgment—not Rule 12(b)(6) dismissal—and that *evidentiary* problems sank the plaintiff bank's claims that title companies had participated in a RICO enterprise with a mortgage origination company. *See id.* at 1101 ("There is simply no support in the record for [plaintiff's] claims.").

---

[3] The *Fitzgerald* decision, properly understood, does not actually support ASH's contention that Cigna's ability to vertically integrate vitiates RICO liability. *See* 116 F.3d at 228 (no enterprise "where a large, reputable manufacturer deals with its dealers and other agents *in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise*" (emphasis added)). Here, of course, ASH and Columbine's involvement is not incidental; rather, the use of these separate entities is essential to Cigna's fraudulent scheme to shift the cost of the Subcontractors' benefits administration to insureds and plans.

[4] ASH spends one sentence on its participation argument, stating simply that "Lietz failed to allege that ASH had any part in directing the affairs of the enterprise," because (according to ASH) the complaint only includes a conclusory allegation that "Defendants directly and indirectly conducted and participated in the affairs of the enterprise." ASH Mem. 10 (quoting SAC ¶ 104). Of course, the only way that ASH can make this argument is to ignore all of the well-pleaded facts supporting the conclusion that ASH conducted and participated in the RICO enterprise, such as those in Paragraphs 27-37, 47-50, and 85-88.

And *BancOklahoma* actually supports Plaintiffs, not Columbine. In *BancOklahoma*, the Tenth Circuit listed a litany of activities that would have sustained the "participation" prong of the plaintiff bank's RICO case, had there been any evidentiary support for them. *See id.* at 1101-02. Those activities would have included the title companies, *inter alia*, "failing to correct … false HUD-1 forms"; "agreeing with LMS [the mortgage origination company] that [it] could falsely show [them] as Settlement Agent on the HUD-1 forms in refinance loans"; "providing figures for LMS to use on HUD-1 forms in … refinance loans"; "changing the way they did business with LMS in refinance transactions"; "deciding to continue to mislead homeowners when they called to ask why their prior mortgages had not been paid off"; and "allowing false HUD-1 forms, closing instructions and first lien letters to go to [plaintiff]." *Id.*

Here, of course, Plaintiffs have alleged that Columbine and ASH purposely included administrative fees when it made determinations as to medical benefits, and then hid the charges from providers when paying them for the services. 2d Am. Compl. ¶¶ 33, 42, 48-50. Columbine even changed its means of collecting the fees to keep concealing them from patients. 2d Am. Compl. ¶ 43. *BancOklahoma* therefore shows that Plaintiffs have adequately pleaded Columbine and ASH's participation in the conduct of the enterprise.[5] *See also VNA Plus*, 29 F. Supp. 2d at 1259 (participation adequately alleged

---

[5] The detailed allegations in the complaint as to how Columbine and ASH participated in the fee-shifting scheme also make *Tal v. Hogan* inapposite. 453 F.3d 1244 (10th Cir. 2006) (cited by Columbine Mem. 11). In that case, the plaintiffs claimed that a competitor misled a public agency in order to secure a development contract. *See id.* at 1262. There was no adequate allegation that the developer participated in the operation or management of the agency, because (*cont'd on next page*)

where defendant-contractor was "not an outside consultant" to the enterprise, and was "involved in the day-to-day operations of the … enterprise by its direct control over the billing services and practices …"); *Imperial Capital Bank v. Sussex Grp., LLC*, 2009 WL 2497326, at *5-6 (W.D. Okla. Aug. 17, 2009) (rejecting motion to dismiss where complaint alleged "that movants prepared conflicting title commitments and concealed material information, making movants integral, if not crucial, participants in the RICO scheme"; complaint "d[id] much more than allege that the movants supplied ordinary title services, or that movants were merely negligent or deficient with respect to the services they provided").

### C.   The Alleged Predicate Acts of Fraud Easily Meet the Rule 9(b) Standard.

ASH and Columbine argue that the complaint does not plausibly allege predicate acts of fraud under the pleading standard of Rule 9(b), but they overlook (or choose to ignore) clear, particularized statements in the complaint concerning the fraudulent acts. Rule 9(b) only asks "a complaint to set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Dawson v. Goldman Sachs & Co.*, Civ. Action No. 13-cv-02030-CMA-KMT, 2014 WL 5465127, at *3 (D. Colo. Oct. 27, 2014) (citing *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)). "Rule 9(b) may be somewhat relaxed where numerous

the defendants merely attempted to mislead the agency and the executive director of the agency did not join the wrongdoing. *See id.* at 1269-70. Here, by contrast, Cigna, Columbine, and ASH worked hand in hand to perpetrate the fraud.

representations are involved or where the responding party clearly is provided notice of the circumstances of the alleged fraud." *Shepard*, 2009 WL 8518288, at *6.

The complaint here does all of the above. It specifies the timeframe when the EOBs were sent to Plaintiffs. *See* 2d Am. Compl. ¶¶ 63-68 (EOBs sent to Ms. Fayeulle in connection with services provided on May 8, 15, 17, 21, 24 and June 18, 2013); ¶¶ 75-76 (EOB received by Mr. Gentrup on May 11, 2011); ¶¶ 85-88 (EOBs sent to Ms. Leitz for services rendered on March 24-26, March 29, April 2-5, 11, 18, and May 4, 11, 18, 29, 2012). It specifies that the EOBs came from Cigna, with active support from Columbine and ASH. *Id.* at ¶¶ 64-67, 76-77 (Columbine); ¶¶ 85-88 (ASH). It explains *why* the communications were fraudulent. *See id.* ¶¶ 51-88. And it explains the "consequences" of the misrepresentation: Plaintiffs or their plans were forced to pay money they were not supposed to pay. *See, e.g.*, *id.* ¶¶ 36-37.

ASH and Columbine argue that because Plaintiffs' claims focus on the EOBs, which are issued by Cigna, they are off the hook. *See* Columbine Mot. 15-16; ASH Mot. 6-8. As an initial matter, a plaintiff does not have to plead that each RICO defendant personally committed a predicate act. *See* 18 U.S.C. § 1962(c) (imposing liability on all persons who "conduct or participate, directly *or indirectly*, in the conduct of such enterprise's affairs through a pattern of racketeering activity") (emphasis added); *Morrow v. Black*, 742 F. Supp. 1199, 1203 (E.D.N.Y. 1990) ("a person who aids and abets in the commission of two or more predicate acts may be held to have committed the acts for purposes of satisfying this element of a civil § 1962(c) claim even though that person has

not personally committed any predicate act").[6] Thus, ASH and Columbine's argument is a red herring: their participation in the enterprise, which was conducted through a pattern of racketeering activity, is enough to impose liability for the pattern. Perhaps recognizing this flaw in their argument, ASH and Columbine attack the allegations of their direct involvement that led to the EOBs as "conclusory." As explained above, this characterization is wrong. *See* supra 12-14.

Further, ASH and Columbine did commit predicate acts of mail and wire fraud in furtherance of the scheme, because they sent misleading Compensation Summaries and Remittance Advice forms to the providers and used wire communications to receive Plaintiffs' fees.[7] *See* 2d Am. Compl. ¶¶ 35, 77, 106-08. While ASH and Columbine protest that Plaintiffs did not rely on the forms they sent to providers, this simplistic argument misses the point: in telling insureds one thing, but providers another, defendants have made it far more likely that their fee-shifting scheme will go undetected and thus could continue. If the providers knew what was happening, they could counsel their patients. *See* 2d Am. Compl. ¶ 35. ASH and Columbine's effort to conceal and perpetuate the fraudulent scheme at issue is also a basis for RICO liability. *See Brannon*, 153 F.3d at 1147-48 (RICO claim could be alleged where participant "somehow made it

---

[6] Likewise, Plaintiffs do not need to prove that each defendant personally committed two predicate acts to prove its liability for the RICO conspiracy alleged in Count II. *United States v. Kamahele*, 748 F.3d 984, 1006 (10th Cir. 2014).

[7] ASH argues that its mailings to providers did not cause Ms. Lietz's injuries. Even assuming that is correct, they were still in furtherance of the fraudulent scheme. And Ms. Lietz has also alleged that the wire transmittals of Ms. Lietz's payments and the false mailings sent by Cigna—which used information from ASH—were the proximate cause of her injuries.

easier to commit or conceal the fraud of which the plaintiff complains") (quoting *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)); *Tal*, 453 F.3d at 1265-66 (allegations satisfied Rule 9(b) where they explained how communications "furthered the fraudulent enterprise"). Thus, it is irrelevant that Plaintiffs did not directly rely on the misrepresentations to the providers. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649-50 (2008) (clarifying that RICO plaintiff need not rely on misrepresentations to state claim, and that "a person can be injured 'by reason of' a pattern of mail fraud" even without such reliance).[8]

The Subcontractors' final alternative argument is that the allegations do not give rise to a "strong inference" of fraudulent intent. *See* Columbine Mot. 16-17; ASH Mot. 7. This argument fails at the outset; the Tenth Circuit does not require a pleader to allege facts giving rise to a "strong inference" of intent when pleading fraud. *See Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1270 and n.5 (10th Cir. 1989).[9] In any event, the facts alleged in the complaint support a "strong inference" that ASH, Columbine, and Cigna intended to defraud insureds and plans into the payments of administrative fees.

---

[8] This separately defeats ASH's proximate cause argument. "Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis" incorporates it. *Bridge*, 553 U.S. at 655.

[9] Defendants' authority for the contrary proposition merely quoted a Southern District of New York case that mentioned the "strong inference" standard for 9(b) pleading used in the Second Circuit. *See Chase v. Bank of New York*, No. 13-cv-02265-RBJ-KMT, 2014 WL 1797473 (D. Colo. May 6, 2014), *Wood v. Wells Fargo Bank, N.A.*, Civ. No. 13-cv-01731-CMA-KMT, 2013 U.S. Dist. LEXIS 152196, at *18 (D. Colo. Oct. 2, 2013). Neither *Chase* nor *Wood* cited or acknowledged *Phelps*, which is controlling in this Circuit.

**D.      ASH and Columbine's Arguments on the Pattern Element are Wholly Devoid of Any Support.**

The Tenth Circuit has explained that RICO's pattern element "requires a showing of 'continuity plus relationship.'" *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)) (emphasis omitted). Contrary to Columbine's unsupported claim that "[t]he Tenth Circuit has interpreted RICO's pattern requirement strictly" (Columbine Mot. 13), it has actually stated that "[t]he relationship test is not a cumbersome one for a RICO plaintiff." *Id.* All that is necessary is that "predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* The continuity aspect, meanwhile, is satisfactorily met by allegations "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989)).

The Second Amended Complaint easily alleges a RICO pattern. First, it points to multiple fraudulent communications with the same method, purpose, and result—improperly extracting administrative fees from unwitting victims. *See, e.g.*, 2d Am. Compl. ¶¶ 32-33 (fraudulent EOBs sent to all insureds); ¶¶ 63-69 (multiple fraudulent EOBs sent to Ms. Fayeulle); ¶¶ 75-79 (multiple fraudulent EOBs sent to Mr. Gentrup);

¶¶ 85-88 (multiple fraudulent EOBs sent to Ms. Leitz). Thus, a "relationship" between the predicate acts[10] is clear.

Moreover, the "continuity" aspect of the RICO pattern here is amply satisfied. The Second Amended Complaint expressly alleges that "[t]he acts of racketeering amount to and pose a threat of continuous criminal activity, because the acts have been and are an ongoing part of Defendants' *regular way of doing business for several years*." 2d Am. Compl. ¶ 111 (emphasis added); *see also id.* ("Acts substantially similar to the predicate acts have been and will be repeated over and over again . . . [they] ha[ve] been directed towards thousands of persons . . . and will be directed towards thousands of other insureds, providers, and plans each year."). At bottom, the continuity requirement is about getting at schemes that "amount to" or "constitute a threat of [] continuing racketeering activity." *Bixler*, 596 F.3d at 761 (emphasis omitted). The fee-shifting scheme alleged here is obviously long-term and it obviously "projects into the future." *See id.* If ASH's and Columbine's pattern argument prevails here, it is difficult to conceive how a plaintiff could ever properly allege a RICO pattern.

All the cases that ASH and Columbine cite are factually inapposite. In *Bixler* (cited at Columbine Mot. 13-14), the plaintiffs' allegations centered on a single corporate transaction (the one-time "transfer[] [of] METCO's uranium mining interests to another corporation"). 596 F.3d at 761. Despite Columbine's out-of-context quote from that case,

---

[10] While it is correct that RICO requires two or more predicate acts to make a pattern, *Bixler*, 596 F.3d at 761, Columbine's characterization of the complaint here as alleging a "single predicate act" is simply wrong, as the above citations to the complaint show.

the Court never suggested that the existence of a single goal or purpose would undermine a RICO pattern.[11]  Similarly, *Hall v. Witteman* focused on a RICO claim stemming from a dispute over a newspaper refusing to run a single ad in connection with a specific election. 584 F.3d 859, 862 (10th Cir. 2009) (cited at Columbine Mot. 13).[12] The factual circumstances of those cases, which obviously fall short of a RICO pattern, bear no resemblance to the situation here.

*Torwest DBC, Inc. v. Dick*, 628 F. Supp. 163 (D. Colo. 1986), *aff'd* 810 F.2d 925 (10th Cir. 1987) (cited at ASH Mot. 10), meanwhile, strongly supports a finding of a pattern here. In *Torwest*, the court again confronted allegations involving a single corporate transaction: a scheme "to obtain a secret profit in the sale of *one* parcel of commercial property." *See* 628 F. Supp. at 166 (emphasis added). It contrasted this situation, where there was no pattern, with a case where "[t]he scheme depended upon the mailing of fraudulent invoices…." *Id.* (citing *United States v. Zang*, 703 F.2d 1186 (10th Cir.1982)). It noted that, in *Zang*, "the government proved that the defendants altered many invoices, each involving different shipments of oil. Every time oil was sold, the purchaser paid more than the seller was legally entitled to charge…." *Id.* This scheme,

---

[11]  After all, RICO enterprises may often have the "single" goal of making money. Columbine's reading of *Bixler* would destroy RICO.

[12]  Columbine also cites to *Duran v. Carris*, 238 F.3d 1268, 1271 (10th Cir. 2001), which involved allegations arising out of a single property dispute between essentially two individuals. Crucial to the court's finding of no pattern was that the alleged RICO acts had "no potential to extend to other persons or entities." *Id.* (quoting *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1556 (10th Cir.1992)). As explained above, Defendants' fee-shifting scheme already extends, and will continue to extend, to numerous other plans and insureds. Indeed, it is entirely implausible—and counter to Plaintiffs' well-pleaded allegations—that Columbine, ASH, and Cigna only engaged in the alleged practices to defraud these particular plaintiffs.

the court emphasized, was a pattern. *See also id.* (pattern established where retailer filed nine fraudulent tax returns over nine months, even though "there was a single victim": "the defendant used the same methods to defraud the state out of a different sum of money many times over"). The paradigmatic patterns described in *Torwest* are functionally indistinguishable from the situation at hand, where Plaintiffs (and others) were overcharged repeatedly in connection with different provider services. *See* 2d Am. Compl. ¶¶ 68 (Ms. Fayeulle); ¶¶ 76, 79 (Mr. Gentrup); ¶¶ 85-88 (Ms. Lietz).

In sum, ASH and Columbine's attack on the sufficiency of the complaint's "pattern" allegations is wholly unfounded.

### E. The Allegations in the Second Amended Complaint Are Sufficient to Let the RICO Conspiracy Claim Go Forward.

ASH and Columbine argue that the § 1962(d) count must also fall if the § 1962(c) claim is deficient. Columbine Mot. 17-18; ASH Mot. 11. Since the complaint has plausibly stated a claim under § 1962(c), the Subcontractors' argument is a non-starter.

To the extent ASH and Columbine separately argue that the complaint does not properly allege a conspiratorial agreement, they again ignore crucial parts of the complaint. *Compare* Columbine Mot. 18 ("Nowhere does the SAC allege any facts or circumstantial indicia of agreements, communications, meetings or other coordinated activities among Cigna, Columbine and [ASH] to establish, effectuate, or further the alleged conspiracy."), *with, e.g.*, 2d Am. Compl. ¶¶ 32-33, 42, 48 (with Cigna's knowledge and encouragement, ASH and Columbine include administrative fees as "medical expenses" in the provider claims they submit to Cigna for payment); *id.* ¶¶ 35,

77, 88 (ASH and Columbine's reports to providers omit that their administrative fees were also included in insureds' and plans' payments for claims); *id.* ¶ 44 (Columbine changed provider agreement to continue to conceal administrative fees). "[A]ccepted as true, the scope and nature of the alleged enterprise and racketeering activity give rise to an inference that defendants conspired to achieve their purposes and were aware that other defendants were participating in the alleged conspiracy." *Shepard*, 2009 WL 8518288, at *9.

Finally, although ASH suggests that Mr. Gentrup and Ms. Fayeulle lack constitutional standing to sue it, it points to no authority holding that plaintiffs in a RICO action are prohibited from suing all of those "persons" who operated or participated in the alleged "enterprise," or who joined the fraudulent scheme as co-conspirators. To the contrary, because Plaintiffs' injuries are traceable to Defendants' conduct of the racketeering enterprise and the conspiracy, RICO gives them legal rights to pursue relief against ASH and the other participants. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (plaintiffs who have a "distinct and palpable injury" may seek relief if Congress has granted them a right of action). Moreover, all Plaintiffs can bring putative RICO class claims against Cigna and each of the Subcontractors. *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1085 (10th Cir. 2014) (affirming class certification for class of borrowers seeking relief from their individual lenders and other lenders in enterprise who engaged in fraud scheme).

## II.    PLAINTIFFS STATE VALID ERISA CLAIMS AGAINST ASH AND COLUMBINE (COUNTS III AND IV).

### A.    Plaintiffs Allege That ASH and Columbine Are Fiduciaries.

A party is a fiduciary with respect to a plan "to the extent [it] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, … or has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Whether a defendant is a "functional fiduciary" under this definition is a "fact-intensive question[]," for which "a motion to dismiss is not the proper vehicle." *Medina v. Catholic Health Initiatives*, No. 13-CV-01249-REB-KLM, 2014 WL 4852272, at *4 (D. Colo. Sept. 30, 2014); *see also In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 827 (S.D. Ohio 2004) ("fiduciary status is a fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss").

ASH and Columbine argue that their alleged responsibilities for administration of the plans were not fiduciary in nature because Plaintiffs fail to allege that they exercised discretion. ASH Mot. 17-20; Columbine Mot. 19-23. To the contrary, Plaintiffs have alleged that ASH and Columbine are "functional fiduciaries … [d]ue to the manner in which they function, including the discretion they exercise in making coverage determinations with respect to ERISA plans." 2d Am. Compl. ¶ 12.

This allegation does not stand alone, as ASH and Columbine contend. Plaintiffs also allege that Cigna, the claims administrator for the plans, delegated to Subcontractors, including ASH and Columbine, its responsibilities for processing and adjudicating

claims. 2d Am. Compl. ¶¶ 27-28. These delegated responsibilities required ASH and Columbine to decide whether a claim was covered under the plans, whether to pay or deny benefits and the amounts of any covered benefits. *Id.* ¶¶ 31, 40, 47; *see also id.* ¶ 40 ("Based on the role it plays in processing chiropractic claims and making benefit determinations for plans governed by ERISA, Columbine is a fiduciary under ERISA"). Thus, Plaintiffs have alleged that ASH and Columbine exercised discretion in making benefits determinations under the plan, which is a core fiduciary function under ERISA. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 219 (2004) ("a benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan"). For this same reason, the discretionary benefit determinations made by ASH and Columbine do not fall within the ambit of "ministerial functions" under the Department of Labor guidance cited by ASH and Columbine. *See* ASH Mot. 18; Columbine Mot. 21.[13]

ASH and Columbine's decision to conceal their administrative fees by including these fees in the covered benefits to be paid by the plans was an integral part of their benefits determinations. *See* 2d Am. Compl. ¶ 42 ("Prior to 2015 . . . when Columbine

---

[13] *Trustees of the Colorado Laborers' Health and Welfare Trust Fund v. American Benefit Plan Administrators, Inc.*, No. 04-cv-2630-EWN-MEH, 2006 WL 2632308 (D. Colo. Sept. 13, 2006), a case relied on by Columbine, is distinguishable. In that case, plaintiffs were not challenging the benefits determinations made by defendant, but instead defendant's failure to give notice to the Fund's stop-loss carriers. The court determined that these notice functions were not fiduciary in nature and were ministerial because they did not entail discretionary authority over the Fund. *See id.* at *7. By contrast, here, Plaintiffs have alleged ASH and Columbine exercised discretionary authority over the benefits determinations that caused plan assets to cover ASH and Columbine's administrative fees and kept the payment of these administrative fees hidden from Plaintiffs.

submitted the claims it processed to Cigna, it billed Cigna for its administrative fees in addition to the providers' agreed rates for medical services."); *see also id.* ¶ 42 ("[W]hen [ASH] submits the claims its processes to Cigna, it bills Cigna for its administrative fees in addition to the providers' agreed rates for medical services."). After receiving ASH and Columbine's determinations, Cigna paid the amount of covered benefits requested by ASH and Columbine in full from plan funds. *See id.* ¶ 31.

The plans themselves did not authorize administrative fees to be mischaracterized or paid as covered benefits. Far from simply applying the terms of the plans, ASH and Columbine exercised their discretion and stepped outside the four corners of the plans in order to conceal their administrative fees as covered benefits. This was a fiduciary act. *See ILWU-PMA v. Conn. Gen. Life Ins. Co.*, 2015 WL 9300519, at *5 (N.D. Cal. Dec. 22, 2015) ("At this stage in the case … it would be premature to hold as a matter of law that defendants had no discretion sufficient to qualify them as fiduciaries, given the allegations that defendants acted *ultra vires* and applied their own frameworks for administering the Plan (rather than merely erring in adhering to the framework in place).").

Thus, Plaintiffs' ERISA claims against ASH and Columbine hinge on ASH and Columbine's discretionary benefits determinations, including their decision to mischaracterize their administrative fees as covered benefits. ASH's argument that Plaintiffs fail to complain about the fiduciary functions it performed for the plan is not based on a plausible reading of the Complaint. The conduct that Plaintiffs challenge is the very same conduct that gives rise to ASH and Columbine's fiduciary status. For the same

reason, Plaintiffs' allegations do not fall short under *David P. Coldesina D.D.S. v. Estate of Simper*, 407 F.3d 1126 (10th Cir. 2005). In that case, the defendant accountants' involvement in plan administration was a ministerial numbers calculation, not a "necessary administrative function[] to be considered plan fiduciaries." *Id.* at 1133. In this case, by contrast, Plaintiffs have alleged that ASH and Columbine were engaged in their discretionary function when they engaged in the complained-of activities—and Plaintiffs' allegations must be accepted as true at this stage.

### B.   Plaintiffs Allege that ASH and Columbine Breached Their Fiduciary Duties.

ERISA fiduciaries like ASH and Columbine must discharge their fiduciary duties with respect to a plan solely in the interest of the participants and beneficiaries and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). A fiduciary also shall not engage in self-dealing; *i.e.*, it "shall not cause the plan to engage in a transaction, if [it] knows or should know that such transaction constitutes a direct or indirect … transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," and it shall not deal with the assets of the plan in its own interest. 29 U.S.C. § 1106(a)(1)(D), (b). Moreover, a fiduciary may not conceal or fail to remedy breaches by other fiduciaries. 29 U.S.C. § 1105.

Plaintiffs have alleged that ASH and Columbine ran afoul of these duties when they collaborated with Cigna to secretly impose their administrative fees on plan

participants and have Cigna use plan assets to pay its own obligations to them. 2d Am. Compl. ¶¶ 120-25; *see Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 742 (6th Cir. 2014) (affirming a final judgment against Blue Cross for breaching fiduciary duty by "inflating hospital claims with hidden surcharges in order to retain additional administrative compensation"); *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 866 (6th Cir. 2013) (Blue Cross breached its fiduciary duty to a plan when it discretionarily set and charged fees to cover obligations it owed to the State of Michigan). There is no merit, therefore, to ASH's argument that Plaintiffs have failed to allege that ASH breached its fiduciary duties.

ASH's other argument—that Plaintiffs have not alleged ASH is liable for Cigna's breaches of its fiduciary duties—fails as well. Under 29 U.S.C. § 1105, a fiduciary is liable for the breaches of its co-fiduciary, if it

> participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, has enabled such other fiduciary to commit a breach; or if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a)(1)-(3).

In arguing that Plaintiffs have failed to allege ASH's knowledge of Cigna's breaches, ASH ignores that Defendants' alleged cost-shifting scheme necessitated knowledge and participation by Cigna, ASH and the other Subcontractors. To this end, Plaintiffs have alleged that ASH inflated the covered benefits by the amount of its administrative fees with full knowledge that Cigna was breaching its fiduciary duties by

31

passing these misrepresentations on to insureds and by using plan funds to pay for ASH's fees. For example, Plaintiffs allege:

- Working with the Subcontractors, Cigna falsifies the EOBs that it sends to insureds. When the Subcontractors submit provider claims to Cigna, they include their administrative fees in the charges. Cigna then misrepresents in the EOBs that the Subcontractor is the health care 'provider' so that Cigna can misrepresent that the administrative fees are being charged by a provider for medical services, when in fact they are charges for the Subcontractor's administrative fees. 2d Am. Compl. ¶ 33.

- By their uniform and fraudulent misrepresentations, Cigna and the Subcontractors are able to shift the cost for the Subcontractors' administrative fees from Cigna to Cigna's insureds and self-insured plans without their knowledge. *Id.* ¶ 37.

- American Specialty Health, like Columbine, works with Cigna to charge its administrative fees to insureds and plans who are treated by these providers, and Cigna and American Specialty Health misrepresent to insureds and plans that they are in fact expenses for covered medical services by the providers. *Id.* ¶ 48.

Finally, ASH argues that Plaintiffs has not pled facts sufficient to state a violation of 29 U.S.C. § 1106 for self-dealing. But Plaintiffs have alleged numerous facts to show the cost-shifting scheme, and these facts also form the basis for Plaintiffs' claims against ASH under 29 U.S.C. § 1106, which Defendants are alleged to have violated "by deceptively using plan assets to pay administrative fees owed by Cigna to the Subcontractors." 2d Am. Compl. ¶ 125. By adding its administrative fees to provider charges and then receiving the money from insureds and plans, ASH participated in the self-dealing transactions.

### C.     Plaintiffs Have Standing to Pursue Their ERISA Claims.

In their opposition to Cigna's motion, Ms. Fayeulle and Ms. Lietz set forth why they have standing under ERISA to pursue Counts III and IV. Like Cigna, ASH argues

that Ms. Lietz cannot pursue Count III (relief under 1132(a)(2) because she is no longer a Siemens employee. But as Plaintiffs explain in the Cigna opposition, the return of money to the plans could still inure to Ms. Lietz's benefit. Therefore, it is likely that her injury "will be redressed by a favorable decision" on Count III. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).

ASH also argues that Ms. Lietz cannot state a claim for benefits in Count IV under 29 U.S.C. § 1132(a)(1)(B). Ms. Lietz is not alleging a *denial* of benefits—because she was overcharged for benefits, not denied them. But she is still seeking to "recover benefits" and "enforce h[er] rights under the terms of the plan"—specifically, she is seeking to recover the improper charges and enforce her right to be charged only for necessary medical expenses for providers. ASH and Cigna violated her rights when they billed her for administrative fees, and § 1132(a)(1)(B) should provide a remedy. *See Smith v. United HealthCare Servs., Inc.*, No. CIV. 00-1163 ADM/AJB, 2000 WL 1198418, at *3 (D. Minn. Aug. 18, 2000) (under § 1132(a)(1)(B), plaintiffs could recover "restitution-type damages for the amount Defendants overcharged them for … copayments"). Ms. Lietz has also successfully alleged a claim for equitable relief in Count IV under § 1132(a)(3), as she explains in her Cigna opposition.

Finally, ASH argues that the Court cannot issue injunctive relief under ERISA to any Plaintiff because it does not issue the EOBs, and thus cannot be ordered to issue accurate ones. But while ASH suggests it does not "control the text" in the EOBs, it (like Columbine) does provide the input, when it administers claims, adds its administrative fees, and submits the altered claims to Cigna for payment. And ASH ignores the many

33

other possibilities for injunctive relief to remedy Defendants' improper conduct. For example, ASH and Columbine could be enjoined from accepting administrative fees paid by the plans and/or insureds, in the absence of evidence that (1) the plan language is amended to permit passing the fees on to them and (2) that the EOBs properly disclose the administrative fees.

## CONCLUSION

The Court should deny ASH and Columbine's motions to dismiss the Second Amended Complaint.

Dated: February 25, 2016

Respectfully submitted,

/s/ Jason M. Knott
Carl S. Kravitz
Jason M. Knott
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1813
Fax: (202) 822-8106
ckravitz@zuckerman.com
jknott@zuckerman.com

D. Brian Hufford
Jason S. Cowart
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 897-3434
Fax: (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

*Attorneys for Plaintiffs Barbara Fayeulle, Matthew Gentrup, and Carol A. Lietz, on behalf of themselves and all others similarly situated*

34

Of Counsel:

Steven A. Schwartz (Pa. I.D No. 50579)     Gerald McGonagle
Alison G. Gushue (Pa. I.D. No. 203669)    David Spencer
CHIMICLES & TIKELLIS LLP         McGONAGLE SPENCER, P.C.
361 West Lancaster Avenue            1533 Locust Street
Haverford, PA 19041                  Kansas City, MO 64108
Tel: 610-642-8500                     816.221.2222
Fax: 610-649-3633                    816.221.2245 (fax)
Email: SAS@Chimicles.com
AGG@Chimicles.com

Anthony Maul
THE MAUL FIRM, PC
68 Jay Street, Ste 201
Brooklyn, NY 11201
(718) 310-3704
afmaul@maulfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2016, I electronically filed the foregoing Opposition to Columbine Chiropractic Plan, LLC, American Specialty Health, Incorporated, and American Specialty Health Group, Inc.'s Motions to Dismiss Second Amended Complaint with the Clerk of the Court for the United States District Court for the District of Colorado by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Jason M. Knott
Jason M. Knott
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1813
Fax: (202) 822-8106
jknott@zuckerman.com

36